# United States Court of Appeals
## For the First Circuit

No. 06-1082

CARLOS VELÁZQUEZ-GARCÍA,

Plaintiff, Appellant,

v.

HORIZON LINES OF PUERTO RICO, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Irene M. Vera with whom Pedro J. Salicrup and Salicrup & Rodríguez were on brief for appellant.
J. Ramón Rivera Morales with whom Jiménez, Graffam & Lausell were on brief for appellee.

January 4, 2007

**STAHL**, <u>Senior Circuit Judge</u>. This case presents an issue of the proper allocation of the burden of proof in cases of alleged discriminatory treatment under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301 <u>et seq.</u> This is the first time that we have been called upon to address this issue. Plaintiff-appellant Carlos Velázquez-García ("Velázquez") sued his former employer, defendant-appellee Horizon Lines of Puerto Rico ("Horizon"), alleging that he had been fired from his job due to his military service, in violation of USERRA. The district court granted summary judgment in favor of Horizon. Because we find that the district court incorrectly applied USERRA's burden-shifting analysis, we reverse.

## I. Background

Because this is an appeal from summary judgment, we review the facts in the light most favorable to Velázquez, drawing all inferences in his favor. <u>See</u> <u>Coyne</u> v. <u>Tabor Partners I</u>, 53 F.3d 454, 457 (1st Cir. 1995).

Horizon is in the business of ocean shipping and transportation, and operates a marine terminal in San Juan, Puerto Rico. Velázquez began work at the terminal for Horizon's predecessor, CSX Lines, in September 1999. He was first employed as a yard supervisor and later became a marine supervisor. Both positions are essentially middle management, giving Velázquez supervisory authority over Horizon's stevedores.

In December 2002, Velázquez enlisted as a reservist in the U.S. Marine Corps. He immediately reported for six months of basic training. He returned to his job after basic training, but continued to report for monthly weekend training sessions, as well as annual two-week more intensive training sessions. Velázquez was a shift employee at Horizon and often had to work weekends, so Horizon needed to adjust his work hours to accommodate his military schedule. In Velázquez's pre-trial deposition,[1] he stated that his superiors complained and pressured him about the difficulty of rescheduling his shifts. He also stated that he was frequently the butt of jokes at work, being referred to as "G.I. Joe," "little lead soldier," and "Girl Scout."

During Velázquez's periods of military service, Horizon continued to pay his full salary. As a result, when Velázquez returned to work, Horizon would deduct from his paycheck amounts necessary to offset Velázquez's military income for those days in which he received both a military and a civilian paycheck.[2]

---

[1] The deposition entered the record as an attachment to Velázquez's Opposing Statement of Material Facts. It and depositions from other employees are the primary evidence pointed to by Velázquez in opposing summary judgment.

[2] We assume that this was done in accordance with the then-applicable regulation at 29 C.F.R. 541.118 (2003), now codified at 29 C.F.R 541.602, allowing for recoupment of military pay from salaried employees. See also 38 U.S.C. §§ 4303(2), 4311 (adjusting wages and salary of uniformed employee allowed under USERRA). Neither party discusses this, and it is not contested.

During this same time period, Velázquez began operating a side business cashing the checks of Horizon employees. Before 2001, Horizon had paid its stevedores' daily wages in cash. In 2001, Horizon began paying daily wages by check instead. Seeing a business opportunity, around February 2004, Velázquez began cashing these employee checks for a fee. He did this almost exclusively during off-duty hours, though he testified to cashing "one or two" checks while on duty. He performed the service primarily outside Horizon's gate or in its parking lot.[3]

Around September 2004, Horizon finished recouping the salary that it was owed for the periods when Velázquez was performing his military duties. On September 21, 2004, seven months after he began his side business, Velázquez was observed cashing checks by Horizon's operations manager, Roberto Batista, one of Velázquez's supervisors and one of the people Velázquez described as having trouble with his military schedule. Batista reported this to several other Horizon managers, and on September 23, 2004, Batista fired Velázquez. The termination letter did not state a reason, but Velázquez was told that his check-cashing side business was in violation of Horizon's Code of Business Conduct

_____

[3]It's not clear from the record whether or the extent to which Velázquez cashed checks on company property. However, whether he cashed checks on duty or on company property has no effect on our analysis.

-4-

("Code").[4]  He was given no warnings or other prior discipline, and had an otherwise clean record as a good employee.

Velázquez brought suit under USERRA, alleging that his firing constituted illegal discrimination due to his military service.[5]  Horizon moved for summary judgment, which the district court granted.  The district court held that Velázquez had not shown sufficient discriminatory animus, nor had he shown that the stated reason for his firing, the Code violation, was mere pretext. This appeal followed.

## II. Discussion

We review a district court's summary judgment de novo. Velez v. Janssen Ortho, LLC, 467 F.3d 802, 806 (1st Cir. 2006).  In doing so, we recognize that "[w]hen a motion for summary judgment

---

[4]The Code states, in relevant part:
No Associate should gain financially or otherwise from a firm or individual with whom the Company does business.  Situations can arise in which an individual unintentionally or unknowingly becomes involved in a conflict of interest. Each Associate is responsible for ensuring that he or she does not have conflicts of interest.  The following examples illustrate situations or relationships that Associates should avoid:
(1) involvement in a situation in which an Associate uses his/her position for any form of private gain, or could lose complete independence, objectivity or impartiality with regard to Company business;
(2) solicitation or acceptance by an Associate or immediate relative (including immediate relative by marriage) of any benefit from any person.

[5]He also brought supplemental claims under Puerto Rico law, which are not on appeal here.

is made . . . an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," <u>id.</u> at 248, and a fact is material if it has the "potential to affect the outcome of the suit," <u>Santiago-Ramos</u> v. <u>Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000) (internal quotation marks omitted) (quoting <u>Sánchez</u> v. <u>Alvarado</u>, 101 F.3d 223, 227 (1st Cir. 1996)). "Neither wishful thinking . . . nor conclusory responses unsupported by evidence will serve to defeat a properly focused Rule 56 motion." <u>Griggs-Ryan</u> v. <u>Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990) (citation omitted).

## A. USERRA Actions

We have not previously addressed the mechanism of proving discrimination claims under USERRA. Thus, we first turn to the statute and its history. USERRA provides, in relevant part, that:

> (a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform,

or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

. . .

(c) An employer shall be considered to have engaged in actions prohibited--(1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

38 U.S.C. § 4311.

The statute was passed in response to the Supreme Court's decision in Monroe v. Standard Oil Co., 452 U.S. 549 (1981), in which the Court held under the predecessor of USERRA, the Veterans' Reemployment Rights Act ("VRRA"),[6] that claims for anti-military employment discrimination would lie only if the employee could show that the discrimination was "motived solely by reserve status." Id. at 559 (emphasis added). This, in effect, kept the burden on the employee to show that any offered reason by the company was actually a pretext. In the House report accompanying passage of USERRA, Congress said that Monroe "misinterpreted the original

---

[6]VRRA was enacted as § 404 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, Pub. L. No. 93-508, 88 Stat. 1578. It was originally codified at 38 U.S.C. § 2021 et seq., before being moved to 38 U.S.C. § 4301 et seq. See Pub. L. No. 102-568, § 506(a), 106 Stat. 4320, 4340 (1992). Those sections were then replaced by USERRA. See Pub. L. No. 103-353, 108 Stat. 3149 (1994).

legislative intent," which was to place "the burden of proof . . . on the employer, once a prima facie case is established." H.R. Rep. No. 103-65, at 24 (1994), reprinted in 1994 U.S.C.C.A.N. 2449, 2457. The House report called instead for application of the burden shifting framework of NLRB v. Transportation Management Corp., 462 U.S. 393 (1983). Id.

Under Transportation Management, which addresses claims of unfair labor practices under the National Labor Relations Act, "the employee first has the burden of showing, by a preponderance of the evidence, that his or her protected status was 'a substantial or motivating factor in the adverse [employment] action'; the employer may then avoid liability only by showing, as an affirmative defense, that the employer would have taken the same action without regard to the employee's protected status." Leisek v. Brightwood Corp., 278 F.3d 895, 898-99 (9th Cir. 2002) (alterations in original) (quoting Transp. Mgmt., 462 U.S. at 401). The circuit courts that have addressed the issue of burden-shifting under USERRA are unanimous in adopting this "substantial or motivating factor" test, rather than the "sole motivating factor" test of Monroe, and in putting the burden on the employer to show lack of pretext. See Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1238-39 (11th Cir. 2005); Gagnon v. Sprint Corp., 284 F.3d 839, 853-54 (8th Cir. 2002); Leisek, 278 F.3d at 899; Hill v. Michelin N. Am., Inc., 252 F.3d 307, 312 (4th Cir. 2001); Sheehan

-8-

v. _Dep't of Navy_, 240 F.3d 1009, 1014 (Fed. Cir. 2001); _Gummo_ v. _Vill. of Depew, N.Y._, 75 F.3d 98, 106 (2d Cir. 1996).

We agree. The language of the statute and the legislative history make clear that the employee need only show that military service was "<u>a</u> motivating factor" in order to prove liability, unless "the employer can prove that the [adverse employment] action <u>would</u> have been taken" regardless of the employee's military service. 38 U.S.C. § 4311(c) (emphasis added). Therefore, we hold that "in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." _Sheehan_, 240 F.3d at 1014.

This two-pronged burden-shifting analysis is markedly different from the three-pronged burden-shifting analysis in Title VII actions. Under the _McDonnell Douglas_ framework, the burden of persuasion in Title VII actions always remains with the employee. Therefore, after the employee establishes a prima facie case of discriminatory animus, the employer only has the burden of producing "some legitimate, nondiscriminatory reason for the employee's [termination]." _McDonnell Douglas Corp._ v. _Green_, 411 U.S. 792, 802 (1973). Then the burden shifts back to the employee to show that "the employer's stated reason for terminating him was

in fact a pretext." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 161 (1st Cir. 1998). By contrast, under USERRA, the employee does not have the burden of demonstrating that the employer's stated reason is a pretext. Instead, the employer must show, by a preponderance of the evidence, that the stated reason was not a pretext; that is, that "the action would have been taken in the absence of [the employee's military] service." 38 U.S.C. § 4311(c) (emphasis added).

## B. Analysis

### 1. Discriminatory Motivation

The district judge held that Velázquez failed to produce sufficient evidence for a reasonable jury to believe that Velázquez's military service was at least "a motivating factor" in Horizon's decision to fire him. That is, the judge ruled that Velázquez was unable to show that Horizon at least partially based its decision to fire him on his military service. The district judge gave three principal reasons for this ruling. First, he discounted Velázquez's testimony of anti-military remarks made by his co-workers, in part because he had not reported any harassment to Horizon. Second, he said that the evidence of the timing of his firing close to a return from training was of no probative value because he had returned from several other training sessions without being fired. Third, he noted that other Horizon employees in the military had not been demoted or fired. Although the

-10-

district judge correctly cited the "motivating factor" test of Sheehan, we believe, after carefully reviewing the record, that the judge committed error on each of these three points.

First, the court discounted Velázquez's testimony of anti-military remarks because it was his own self-serving testimony and because he had not previously reported it or made a formal complaint. Here, the distinction in Rule 56 between "specific facts" and "mere allegations" is important. Fed. R. Civ. P. 56(e). Had Velázquez merely rested on allegations of military discrimination, this would be a different case. Instead, he provided deposition testimony presenting specific instances of anti-military remarks, as well as complaints and pressure from his superiors, and it is for the jury, not the judge, to determine his credibility. See Anderson, 477 U.S. at 255 ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Moreover, whether a nonmovant's deposition testimony or affidavits might be self-serving is not dispositive. It is true that testimony and affidavits that "merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge" are insufficient. Santiago-Ramos, 217 F.3d at 53 (citing Roslindale Coop. Bank v. Greenwald, 638 F.2d 258, 261 (1st Cir. 1981)).

-11-

However, a "party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." Santiago-Ramos, 217 F.3d at 53 (internal quotation marks omitted) (quoting Cradle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997)). Therefore, provided that the nonmovant's deposition testimony sets forth specific facts, within his personal knowledge, that, if proven, would affect the outcome of the trial, the testimony must be accepted as true for purposes of summary judgment. See Napier v. F/V Deesie, Inc., 454 F.3d 61, 66 (1st Cir. 2006); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 50-51 (1st Cir. 1999).

On appeal, Horizon argues that the anti-military comments were just "stray remarks," and as such cannot be sufficient evidence of discriminatory animus. If true, that would undermine Velázquez's argument that the issues raised are "genuine." See Anderson, 477 U.S. at 248. But Horizon's argument oversimplifies the analysis.[7] First, it is only true that "'stray workplace remarks' . . . normally are insufficient, standing alone, to

---

[7]In the following analysis we assume, without deciding, that standards for showing discriminatory animus under other anti-discrimination statutes, such as Title VII, apply equally to showings of discriminatory animus under USERRA. See Tarin v. County of Los Angeles, 123 F.3d 1259, 1266 n.7 (9th Cir. 1997) (noting, in case under predecessor to USERRA, that "Title VII analysis has been extended to cases involving discrimination on the basis of other protected characteristics").

establish . . . the requisite discriminatory animus." González v. El Día, Inc. 304 F.3d 63, 69 (1st Cir. 2002) (emphasis added); see Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001). Here, Velázquez points not only to the remarks by co-workers, but also to complaints by Batista and others about the difficulty of adjusting Velázquez's work schedule, and to the timing of his firing (which we address below). See McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals, 140 F.3d 288, 300-01 (1st Cir. 1998) ("stray remarks may properly constitute evidence of discriminatory intent for the jury to consider in combination with other evidence"); cf. Santiago-Ramos, 217 F.3d at 55 (decisionmaker's comments and timing of firing are material facts for a jury to consider).

Here, the remarks that Velázquez testified to were not made by those who participated in the decision to fire him, and this does limit their probativeness. See McMillan, 140 F.3d at 301. But at least one such speaker, Juan Carrero, was shift marine manager and appears to be superior to Velázquez. Carrero was also in part responsible for scheduling, which was the source of Horizon's problems with Velázquez. Thus, his remarks could carry some weight with a jury. Furthermore, stray remarks by nondecisionmakers, while insufficient standing alone to show discriminatory animus, may still be considered "evidence of a company's general atmosphere of discrimination," and thus can be

-13-

relevant.  Santiago-Ramos, 217 F.3d at 55 (citing Sweeney v. Bd. of Trustees of Keene State Coll., 604 F.2d 106, 113 (1st Cir. 1979)).  "[S]uch evidence . . . does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff."  Cummings v. Standard Register Co., 265 F.3d 56, 63 (1st Cir. 2001) (internal quotation marks omitted) (quoting Conway v. Electro Switch Corp., 825 F.2d 593, 591 (1st Cir. 1987)).[8]

Finally, the fact that Velázquez failed to report the remarks earlier is not dispositive.  Cf. Faragher v. City of Boca Raton, 524 U.S. 775, 808 (1998) (holding that plaintiff's failure to report sexual harassment is not an affirmative defense to a Title VII claim where plaintiff was discharged).  In an atmosphere such as a working seaport, it is reasonable for a person to avoid making a scene over such behavior, or even to believe that the

_____

[8]We note also that the comments at issue in González and the other "stray remark" cases cited by Horizon were ambiguous even as to their meaning, much less whether they could be taken as evidence of discrimination.  See González, 304 F.3d at 70 ("it is far from clear that the alleged remarks bespeak any age-based animus at all"); Williams v. Raytheon Co., 220 F.3d 16, 20 (1st Cir. 2000) (remarks about changing company culture of "old, white men" not literal, given hiring practices); Shorette v. Rite Aid of Me., Inc., 155 F.3d 8, 13 (1st Cir. 1998) (asking employee how old he was and when he planned to retire "demonstrates nothing").  Here, the remarks that Velázquez describes in his testimony are clearly anti-military.  Of course, this is not to say that they are necessarily proof of anti-military discriminatory animus at Horizon. A jury could find, for example, that the remarks were not malicious.  But this is distinct from the question of the actual meaning of the words being uttered, for which there is no ambiguity.

behavior is only in jest, only to discover too late that it was a harbinger of worse discrimination to come. Velázquez's failure to report the behavior may be considered by a jury in judging his credibility, but it is evident to us that a jury could reasonably decide to place no weight on his prior silence. Thus, it is a jury that should ultimately decide.

The district judge next discounted the timing of Velázquez's firing, saying that the fact that he was fired after returning from his military service is of no probative value, given that he had returned from other periods of service without being fired. But the emphasis of Velázquez's argument is elsewhere. The important factor, he argues, is not the time of his return from service, but rather the time of his final recoupment of the salary differential that he owed to Horizon. Horizon, according to Velázquez, waited until Velázquez had paid back the money he owed Horizon for the periods when his civilian salary was supplemented by his military salary. Once he had repaid the overage, he claims, Horizon then found the pretext to fire him.

Such facts, if true, could be considered evidence of discriminatory animus. The other USERRA cases that address the timing of firing look at "proximity in time between the employee's military activity and the adverse employment action." Sheehan, 240 F.3d at 1014; see Maxfield v. Cintas Corp. No. 2, 427 F.3d 544, 552 (8th Cir. 2005). But that is not an exclusive test, and there is

-15-

no reason to limit ourselves to looking only at the proximity of the adverse employment action to military activity. The proximity to other military-related events may also be probative. If what Velázquez alleges is true, Horizon should not escape liability for making the tactical decision to wait until it recouped the salary it was owed before using a pretext to fire Velázquez.

Finally, the district judge held that the fact that the company had not fired other employees who served in the military demonstrated that they did not fire Velázquez for discriminatory reasons. As an initial matter, the failure to treat all members of a class with similar discriminatory animus does not preclude a claim by a member of that class who is so treated. Cf. Conn. v. Teal, 457 U.S. 440, 455 (1982) ("Title VII does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons of his or her race or sex were hired"); Furnco Constr. Corp. v. Waters, 438 U.S. 567, 579 (1978) ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.").

Furthermore, the district court failed to address Velázquez's argument that the other employees were not shift employees, and that therefore their military service did not cause as much scheduling conflict as his did. A reasonable jury could conclude that the different situations of these employees could

result in Horizon firing Velázquez for his military service, while tolerating the other employees serving in the military.

For these reasons, we find that Velázquez has presented sufficient facts to withstand summary judgment on the question of whether his military status was at least a motivating factor in his dismissal. The issue is one for a jury.

2. Pretext

After holding that Velázquez had not provided sufficient evidence to show that his military status was a motivating factor in his dismissal, the district judge held further that, even if he had, Horizon had adequately demonstrated that it had a non-pretextual reason for firing Velázquez.

The district judge stated the rule of law correctly, adopting, as we have today, the Federal Circuit's holding in Sheehan. However, he proceeded to implicitly follow the McDonnell Douglas framework, keeping the burden on Velázquez. For example, he held that Horizon "was entitled to take the action it did," Dist. Ct. Op. at 12, that it was "justified in dismissing" Velázquez, id. at 13, and that Velázquez "failed to produce evidence to counter this determination and has produced no evidence that would lead the Court to believe that [Horizon's] stated reason for his termination was pretextual in nature," id. The district court thus kept the burden of persuasion on Velázquez, and this was error.

The issue under USERRA is not whether an employer is "entitled" to dismiss an employee for a particular reason, but whether it would have done so if the employee were not in the military. Here, Velázquez's violation of the Code may well be a fireable offense under Horizon's policies, but that is only the beginning of the analysis. Horizon must go further and demonstrate, by a preponderance of the evidence, that it <u>would</u> indeed have fired Velázquez, regardless of his military status.

There is sufficient doubt on this issue to make it a jury question. Velázquez points out that he never received a copy of the Code,[9] nor any warnings to stop his check-cashing business, both of which one might have expected to occur before a firing, particularly in a case where the Code is arguably ambiguous as to whether something like check-cashing is in fact a violation.[10]

---

[9]Our concern here is not strictly the lack of notice that the check-cashing was in violation of the Code. That issue does not arise in the USERRA analysis--USERRA's concern is discrimination, not due process. However, the failure to distribute the Code could be considered some evidence of how seriously Horizon took the Code and its violations. One would have expected a company to inform its employees about offenses that would result in immediate firing without warning, particular when the seriousness of such offenses is not intuitively obvious.

[10]At oral argument, Horizon's principal explanation for the seriousness of the offense was that it contradicted a company policy of paying employees by check, rather than cash. Thus, counsel for Horizon argued, a middle manager of the company was facilitating something directly contrary to the company's desires. While we can think of reasons why having a manager run a check-cashing business for his supervisees is inappropriate, this proffered reason is not convincing. At some point, the stevedores must turn their checks into cash, and it's not clear to us why

Furthermore, some other employees who had similar Code violations were not summarily fired, as Velázquez was.  Also questionable is the fact that Velázquez had been cashing checks for Horizon employees adjacent to Horizon property for seven months before Horizon claimed to discover these acts.  A reasonable jury could question the truth of that claim, given that the alleged discovery occurred so close to the final recoupment of salary.[11]  Given this, Horizon has not met its burden at summary judgment of showing that no reasonable jury could find that Velázquez's check-cashing business was a mere pretext for his dismissal.  Horizon points only to the Code violation and, under USERRA, that is not enough.

## III. Conclusion

For the forgoing reasons we <u>reverse</u> the district court's grant of summary judgment and <u>remand</u> for further proceedings consistent with this opinion.

---

Horizon should desire otherwise.  As far as we can tell, the switch to checks was merely for the convenience of the company, not because of any desire for their employees' funds to be slightly less liquid.

[11]Batista did testify that he had "heard rumors" about the check-cashing prior to September 21, 2004.