# United States Court of Appeals
## For the First Circuit

No. 14-2121

JOSEPH ANGIUONI,

Plaintiff, Appellant,

v.

TOWN OF BILLERICA; DANIEL ROSA,
individually and in his official capacity as Chief of Police,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

John V. Siskopoulos, with whom Alexandra C. Siskopoulos and
Siskopoulos Law Firm, LLP were on brief, for appellant.
Jeremy Silverfine, with whom Deidre Brennan Regan and Brody,
Hardoon, Perkins & Kesten, LLP were on brief, for appellees.

September 23, 2016

**LIPEZ**, **Circuit Judge**.    Joseph Angiuoni, a military veteran, brought a claim against the Town of Billerica and Daniel Rosa, Chief of the Billerica Police Department, under the Uniform Services Employment and Reemployment Rights Act ("USERRA"), see 38 U.S.C. § 4301-4335, claiming that his status as a veteran was a motivating factor for defendants' termination of his employment. A jury found in favor of defendants.    In this appeal, Angiuoni argues that the district court made a series of errors in its evidentiary rulings that warrant a new trial.    We affirm.

## I.

We recite the facts as the jury could have found them. See Sinai v. New Eng. Tel. & Tel. Co., 3 F.3d 471, 472 (1st Cir. 1993).    Angiuoni, an Army veteran, began working as a probationary patrol officer for the Billerica Police Department ("Department") after graduating in 2009 from the Massachusetts Bay Transportation Authority Police Academy.    The Department's probationary period lasts eight weeks and is designed to determine if a new officer will be a good fit for the Billerica force.

The Department has a Field Training Program to help police officer trainees build on their instruction at the academy. One component of the program is on-the-job feedback from Field Training Officers ("FTOs"), who accompany individual trainees in cruisers to evaluate and comment on their performance.

Angiuoni's FTOs observed and reported on numerous incidents and issues with his performance. For example, early in his field training, Angiuoni backed a cruiser into a wall while transporting two prisoners to court. Then, on the return trip, he shouted at a crew of prisoners cleaning up the roadside, which his FTO, Officer McKenna, told him was inappropriate behavior.

On another occasion, Angiuoni, accompanied by FTO Moran, made a traffic stop of a car containing two females and two males who appeared to be in their late fifties or early sixties. When Angiuoni told Moran that he planned to search the car for drugs because he thought he had smelled something, Moran said he did not smell anything and told Angiuoni not to search the car. Angiuoni replied that he was taught at the police academy to search every car he stopped because of the potential for drugs. Moran explained that that was not correct, and, in that instance, finding drugs was unlikely given the ages of the individuals.

Similarly, Angiuoni argued with Officer Moran when they spotted a white van parked at a shopping mall with two people apparently "making out" in the back. Angiuoni ran toward the van, disregarding Moran's instructions, twice, not to do so. When approached and questioned, the female in the vehicle explained that the male was her boyfriend. Despite Moran's contrary guidance, Moran insisted that he was taught at the police academy

to rush a vehicle in such circumstances because a rape could have been happening.

Two other episodes that occurred while Officer Moran accompanied Angiuoni similarly involved Angiuoni's ignoring instructions or debating with Moran about what should be done. During one exchange, after Moran explained how Angiuoni should have handled a house alarm call differently, Angiuoni complained that another officer who started training around the same time as he did was being treated more favorably. Moran explained that that officer had prior law enforcement experience in Massachusetts and, hence, was already familiar with the responsibilities of a police officer. Angiuoni then said he had been in Iraq, and he knew what things were like and that people were out to get him.

In May 2009, Angiuoni took handgun and rifle tests. He passed the handgun test, but did not qualify on the rifle test. He was the only officer who failed the rifle test that day and the only officer in that training cycle who did not qualify.

When Angiuoni's probationary period ended, Lieutenant Opland, who oversees operation of the Field Training Program, did not clear Angiuoni for patrol. The FTOs who had worked with him reported concerns about Angiuoni's progress, demeanor, and professionalism, and stated that he did not listen to feedback, had trouble taking instructions, and became argumentative with

them.  They also noted that he had difficulty with simple tasks, such as writing reports and radio communications.

Lieutenant Opland met with Angiuoni to review the Report of Deficiencies and to discuss the extension of his probation and training.  The Report noted, among other things, that Angiuoni needed to work on proper radio operation and communication, and on preparing police reports; that he needed to become familiar with the town and its streets; that he did not qualify ("DNQ") on the rifle test and needed more training; and that he was involved in an accident with the cruiser.  Despite the negative feedback, Lieutenant Opland and Chief Rosa decided to extend Angiuoni's probationary period and provide him with further field training.

At about the same time, in June 2009, a rumor circulated at the Department regarding layoffs due to budgetary cuts. Angiuoni told Officer Moran that the FTOs were out to get him because of the possible layoffs.  According to Angiuoni, Officer Moran said during this conversation that layoffs would be more dangerous to him, i.e., Moran, than to Angiuoni because Moran was not a veteran.  According to defendants, however, Moran explained to Angiuoni that, if any FTOs were to be laid off, it would be him (Moran) since he was the most junior FTO, that Chief Rosa would have to lay off about one-sixth of the Department to even reach Moran, and that any layoff was unlikely.  No layoffs occurred.

During Angiuoni's extended probationary period, between June and November 2009, the problems identified in his Report of Deficiencies persisted. On numerous occasions, Angiuoni either confused the address to which he was dispatched or could not find the location, despite having the correct address. In one instance involving a high-stress police situation, Angiuoni was twenty minutes late to the scene because he had gotten lost. He blamed a fellow officer for his delayed arrival, telling his superior that his colleague had given him the wrong directions even though the colleague had in fact helped him find the location.

Other performance issues also arose. For example, his FTO observed Angiuoni set up a radar device at a sharp curve in a road, despite having been told that that spot was not a good location for radar. On another occasion, an administrative complaint was filed based on Angiuoni's conduct during a traffic stop of a young female driver. The complaint alleged that Angiuoni had sworn at the driver and made derogatory comments about her relative who worked at the local sheriff's office.

In November 2009, after meeting with Angiuoni to discuss the continuing issues with his performance, Chief Rosa placed Angiuoni on administrative leave pending a hearing with the Town Manager. A few days later, Rosa met again with Angiuoni at the request of the police union president to go over the problems with his performance. During that conversation, Angiuoni complained

about his FTOs and stated, in particular, that Officer Moran had said that veterans should not get special treatment.

In a written report presented to the Town Manager, Chief Rosa outlined areas of concern regarding Angiuoni's performance, including: lack of self-initiative on patrol; poor radio communications (procedure and etiquette); lack of knowledge of town streets, which interfered with his ability to respond to calls in a timely manner; failure to follow protocol regarding officer safety; lack of situational awareness; poor quality and accuracy of police and accident reports; citizen complaint regarding his handling of a traffic stop; and a DNQ on the rifle test. The report also noted that Angiuoni lacked the "ability to take responsibility for his own actions or take any constructive criticism during his training phase," and that he did not make adequate progress during the extended probationary period despite being informed of his issues in June. Following Chief Rosa's presentation, the Town Manager terminated Angiuoni's employment.

Angiuoni subsequently filed this action against the Town of Billerica and Chief Rosa, claiming, inter alia, that defendants terminated his employment "due to [his] military service," in violation of the USERRA. In a pretrial motion, Angiuoni asked the court to exclude evidence of the number of veterans in the Department for lack of probative value, stating, "[t]here is no allegation that . . . [defendants] harbored discriminatory animus

against veterans _in general_."  In response, defendants argued that such evidence was relevant because Angiuoni had alleged in his amended complaint that defendants "expressed a strong antagonism towards veterans," and that there was a "general bias against veterans" in the Department.  The district court denied the motion without prejudice, thereby permitting Angiuoni to renew the motion during the trial.

The case proceeded to trial in September 2014.  The jury returned a verdict in favor of defendants, finding that Angiuoni had not shown that his veteran status was a substantial or motivating factor in defendants' decision to terminate him.  The district court entered judgment, and this appeal followed.

On appeal, Angiuoni identifies three evidentiary errors that he argues warrant a retrial.  First, he asserts that the district court erred in excluding evidence of a rifle test that he took after his termination from the Department, which he claims would have rebutted the results of the rifle test that he had failed during his training.  Second, he claims that the court failed to sequester witnesses in violation of Federal Rule of Evidence 615.  Finally, he argues that the court improperly admitted prejudicial and inflammatory evidence on the number of veterans at the Department.

USERRA prohibits employers from discriminating on the basis of military service. The operative provision, 38 U.S.C. § 4311, states, inter alia, that a person who "has performed[] . . . service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of [the military service]." Id. § 4311(a). An employee making a discrimination claim under USERRA bears the initial burden of showing, by a preponderance of the evidence, that the employee's military status was "at least a motivating or substantial factor" in the adverse employment action. Valázquez-García v. Horizon Lines of P.R., 473 F.3d 11, 17 (1st Cir. 2007); see also Sheehan v. Dep't of Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001). Such discriminatory intent or motivation may be proven by direct or circumstantial evidence, which includes, among others, "inconsistencies between the proffered reason and other actions of the employer, an employer's hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." Sheehan, 240 F.3d at 1014. If the plaintiff meets this initial requirement, the burden shifts to the employer, who must then "prove, by a preponderance of the evidence, that the action would have been

taken despite the protected status." Velázquez-García, 473 F.3d at 17 (quoting Sheehan, 240 F.3d at 1014); see 38 U.S.C. § 4311(c)(1).

With this background in mind, we address each of Angiuoni's evidentiary claims.

## A. Rifle Test Evidence

On the third day of trial, Angiuoni's counsel tried to show the jury a physical exhibit containing the results of a rifle test that Anguioni took after his termination. Specifically, the exhibit was an unmarked and unidentified picture of a bullseye with multiple shots in the middle. Defense counsel objected. In a sidebar conversation with counsel for both parties, the district court judge asked why the evidence was relevant. Angiuoni's counsel said it would show that Angiuoni's failure on the May 2009 rifle test was likely attributable to a faulty rifle. Defense counsel argued that the issue at trial was whether Angiuoni failed the rifle test during his employment. His rifle skills following his termination were irrelevant. The court sustained the objection.

The parties dispute whether Angiuoni waived this claim of error by failing to make an offer of proof or mark the exhibit for identification in the trial proceedings. We need not -- and hence do not -- address the waiver issue because we reject Angiuoni's claim on the merits. See, e.g., Yeboah-Sefah v. Ficco,

556 F.3d 53, 68 n.6 (1st Cir. 2009) ("[B]ecause we easily reject petitioner's claim on the merits, we need not resolve this dispute [regarding waiver].").

We afford trial courts "a wide berth in respect to regulating the scope of rebuttal testimony."  United States v. Sebaggala, 256 F.3d 59, 66 (1st Cir. 2001); see also Geders v. United States, 425 U.S. 80, 86-87 (1976) ("Within limits, the [trial] judge may control the scope of rebuttal testimony, . . . [and] may refuse to allow cumulative, repetitive, or irrelevant testimony . . . .").  Indeed, while "[r]ebuttal evidence may be introduced to explain, repel, contradict or disprove an adversary's proof," its "admissibility is a matter for the trial court's discretion."  United States v. Laboy, 909 F.2d 581, 588 (1st Cir. 1990).  The wide latitude afforded to trial courts extends to "determining whether proposed evidence is proper rebuttal."[1]  United States v. Thuna, 786 F.2d 437, 444 (1st Cir. 1986); see also United States v. Cepeda Penes, 577 F.2d 754, 760 (1st Cir. 1978).

---

[1] Hence, we reject Angiuoni's argument that de novo review should apply because rebuttal evidence is admissible as a matter of right.  As we noted above, his underlying assertion is incorrect.  See Laboy, 909 F.2d at 588.  Moreover, the argument misses the point because the district court decided that the evidence that Angiuoni sought to introduce was irrelevant (and thus did not constitute rebuttal evidence), not that Angiuoni could not present rebuttal evidence.

- 11 -

We find no such abuse of discretion here. Most critically, even if we were to assume that the exhibit that Angiuoni sought to present to the jury -- an unidentified picture of a bullseye -- was the result of Angiuoni's rifle test, it is undisputed that the test occurred after his termination from the Department. Hence, at best, the evidence has limited relevance to the question of whether defendants improperly relied on the result of Angiuoni's May 2009 rifle test to evaluate his fitness to be a police officer. Relatedly, we do not see how the subsequent test could have conclusively rebutted the result of Angiuoni's May 2009 rifle test, especially when various officers testified at trial that they shot with the same fully inspected rifle on the same day without any problems.

Additionally, Angiuoni's DNQ on the rifle test was only one issue among many that defendants considered in evaluating his suitability for police work. Even if the subsequent rifle test could help demonstrate that Angiuoni's failure in May 2009 does not fairly portray his rifle skills, the probative value of the evidence for his discrimination claim would be low. In sum, it was well within the district court's ample discretion to deny admission of Angiuoni's rifle test evidence.

## B. Sequestration of Witnesses

Angiuoni also argues that the district court's failure to sequester witnesses violated Federal Rule of Evidence 615. Rule

615 provides that, "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own." Fed. R. Evid. 615 (emphasis added). Here, however, Angiuoni never asked for sequestration. On the first day of trial, the following exchange took place between Angiuoni's counsel and the district court:

> [Angiuoni's Counsel]: Thank you, your Honor. A quick question beforehand. I noticed the next witness after this witness in the courtroom. I wasn't sure if there was any concern, sequestration for having witnesses --
>
> The Court: Well, if there hasn't been any motion about sequestration, then there's no problem.
>
> [Angiuoni's Counsel]: The plaintiff calls Dwayne Eidens.

While Angiuoni tries to characterize his counsel's "question" regarding sequestration as a request, it cannot be so construed in light of the subsequent remarks, which included counsel remaining silent after the district court indicated that it did not understand that any request had been made.

"Absent a request from counsel, the district court enjoys broad discretion in determining whether or not to sequester witnesses before their testimony." United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004); see also United States v. De Jongh,

937 F.2d 1, 3 (1st Cir. 1991). No such abuse occurred here.[2] Indeed, other than conclusory statements about how the witnesses' presence compromised effective cross-examinations, Angiuoni has not shown how failure to sequester witnesses was prejudicial in this case. See United States v. Charles, 456 F.3d 249, 257 (1st Cir. 2006) (noting that "a district court's decision on whether to sequester a witness" will "not be questioned absent a showing of prejudice") (citing United States v. Jewett, 520 F.2d 581, 584 (1st Cir. 1975)). If anything, the record shows that Angiuoni's counsel himself asked witnesses during cross-examinations whether they had been present during the testimonies of other witnesses to help refresh their memories and elicit favorable responses. Thus, the court did not abuse its discretion in deciding not to sequester witnesses sua sponte.

## C. Evidence Regarding the Number of Veterans at the Department

Finally, Angiuoni contends that the district court abused its discretion in allowing evidence regarding the number of veterans at the Department.[3] In particular, he argues that the

_____

[2] Arguably, plain error review should apply here because Angiuoni did not object to the court's decision not to sequester witnesses. His claim fails even under the abuse of discretion standard, however, and thus we do not linger on the standard of review. See United States v. McDonough, 727 F.3d 143, 163 n.12 (1st Cir. 2013).

[3] As with the previous issues, the parties dispute whether Angiuoni waived this contention. Because Angiuoni's claim "fails

- 14 -

evidence was highly prejudicial and inflammatory because it could have misled the jury to believe that Angiuoni had to prove that the Department as a whole had an anti-military bias, when, in fact, his USERRA discrimination claim at trial was that "Officer Moran[] held an anti-military bias against him," and that "Chief Rosa and the Department relied on Officer Moran's biased and unfavorable review of Angiuoni" in making a termination recommendation.

First, we disagree with Angiuoni's characterization of his claim. In his amended complaint, Angiuoni alleged that "certain officers and superiors in the Department, including Plaintiff's FTO, ha[d] expressed a strong antagonism to veterans." He then listed "[e]xamples of incidents and comments that demonstrate [such] animus," which included conduct of officers at the Department other than Officer Moran. Similarly, in his Answers to Interrogatories, Angiuoni argued that there is "a general bias against veterans" within the Department. At the least, therefore, his own allegations made the issue of generalized bias relevant.

We also reiterate here that an employer's "expressed hostility towards [veterans]" may be a relevant factor in determining discriminatory motivation. Sheehan, 240 F.3d at 1014; see also Hance v. Norfolk S. Ry. Co., 571 F.3d 511, 518 (6th Cir. 2009); Leisek v. Brightwood Corp., 278 F.3d 895, 900 (9th Cir.

under even the less deferential abuse of discretion standard, we decline to resolve the dispute." McDonough, 727 F.3d at 163 n.12.

- 15 -

2002).  Also, courts have considered an employer's lack of general bias or hostility towards people with military service in rejecting a discrimination claim under the USERRA.  See Becker v. Dep't of Veterans Affairs, 414 F. App'x 274, 277 (Fed. Cir. 2011) (considering the fact that other veterans were selected for interviews by the employer in denying a claim that the plaintiff's veteran status was a motivating factor in not being selected for an interview); Burroughs v. Dep't of Army, 254 F. App'x 814, 817 (Fed. Cir. 2007) (denying a USERRA discrimination claim because, inter alia, "there is nothing in the record to suggest anti-veteran animus on the part of the screening committee in particular, and the agency as a whole").  Hence, while we acknowledge, as did the district court, that the probative value of the evidence regarding the number of veterans at the Department is low, see Velázquez-García, 473 F.3d at 20 (noting that "the failure to treat all members of a class with similar discriminatory animus does not preclude a claim by a member of that class who is so treated"), we cannot conclude that allowing such evidence was an abuse of discretion.

Affirmed.