# United States Court of Appeals
## For the First Circuit

Nos. 07-2691, 07-2692

EDMUND F. BURKE,

Plaintiff, Appellee/Cross-Appellant,

v.

STEVEN MCDONALD,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Howard, Selya, and Hansen,[*]
Circuit Judges.

Joseph P. Kitteredge, with whom Rafanelli & Kitteredge, P.C., Brian Rogal, and Rogal & Donnellan, P.C., were on brief, for appellant/cross-appellee.
Robert S. Sinsheimer, with whom Lauren Thomas and Denner Pellegrino, LLP, were on brief, for appellee/cross-appellant.

July 17, 2009

[*]Of the Eighth Circuit, sitting by designation.

**HOWARD, Circuit Judge.** In 1998, despite the fact that police had obtained DNA evidence excluding him as the perpetrator, Edmund Burke was arrested for murder and forced to spend a total of forty-two days in jail. Burke subsequently filed a civil rights lawsuit under 42 U.S.C. § 1983 against a panoply of those involved in the investigation of the crime, and after years of litigation, a federal jury found Massachusetts State Police Trooper (Tpr.) Steven McDonald liable for violating Burke's Fourth Amendment rights and awarded $400,000 in damages. After trial, the district court denied Tpr. McDonald's motions for judgment as a matter of law, a new trial, and remittitur. The court also awarded attorneys' fees to Burke, although it reduced the amount of the fees award from the requested $292,463.50 (plus expenses of $34,358.55) to $118,882.50 (plus expenses of $12,632.89) on the ground that Burke's success was "decidedly partial."[1]

Both parties now appeal decisions of the district court: Tpr. McDonald appeals the decision not to limit damages (and evidence thereof) to the period between arrest and arraignment; Burke, as cross-appellant, appeals the attorneys' fees reduction.

---

[1]These figures are drawn from the district court's Order Awarding Attorneys' Fees, which notes that Burke's underlying fee application asked for $294,024.50, but that the application "mistakenly includes hours that the plaintiff subsequently voluntarily withdrew." The parties on appeal do not dispute the district court's correction.

Discerning no errors in the district court's handling of the case on either matter, we affirm.

## I.  Background

### A.  The Factual Milieu

Because we had the opportunity to develop the factual context of this case in some depth when considering an appeal from the district court's prior entry of summary judgment for the defendants, see Burke v. Town of Walpole (Burke I), 405 F.3d 66 (1st Cir. 2005) (vacating the district court's grant of summary judgment as to Burke's Fourth Amendment § 1983 claim against Tpr. McDonald, and affirming in all other respects), we will limit our factual exposition to a summary of the necessary details.  Except where indicated, these facts are not in serious dispute for purposes of these appeals.

On December 1, 1998, Irene Kennedy, a 75-year-old woman, was the victim of a particularly grisly murder involving a severe beating, strangulation, and multiple stab wounds.  The victim's breasts, which were exposed when her body was found in a wooded Walpole, Massachusetts park, each bore a human bite mark.  The ensuing investigation into the crime included the collection of DNA samples in the form of saliva from the bite marks on the victim's body, and of saliva and other forensic samples from Burke, a suspect in the crime.  Because Massachusetts did not at that time operate a facility capable of expedited DNA analysis of multiple-

source samples, the samples were sent to the Maine Crime Laboratory for immediate analysis by Theresa Calicchio, a forensic DNA chemist.

Calicchio testified at the trial in this case that, on the morning of December 10, 1998, she called Tpr. McDonald and told him that the DNA analysis had excluded Burke as the source of DNA collected from the victim's body.[2] Tpr. McDonald, however, failed to convey this information to his colleagues, this despite the fact that he successfully conveyed the findings of other non-DNA bite mark analyses that implicated Burke in the crime. As a result, a warrant application was filed that afternoon which omitted any mention of the DNA results, and an arrest warrant issued shortly thereafter.

Burke was arrested at his home that afternoon and detained overnight, prior to being arraigned in state court the next day. Shortly after the arraignment began, Tpr. Kevin Shea, Tpr. McDonald's colleague and co-investigator into the murder of

---

[2]Whether Calicchio actually told Tpr. McDonald that Burke was excluded on the day of the arrest was hotly contested at trial, and Tpr. McDonald maintains on appeal that the evidence supporting Calicchio's version of events is insufficient to support a finding of liability, thereby entitling him to judgment as a matter of law. We disagree. Calicchio testified that she "told [Tpr. McDonald] that Ed Burke was excluded," and when asked if she had any doubt about that fact, she stated, "No, no doubt." Suffice it to say that "it was the jury's role to assess the credibility of witnesses and to resolve inconsistencies in the evidence." Wagenmann v. Adams, 829 F.2d 196, 206 (1st Cir. 1987); see also Ayala-Rodríguez v. Rullan, 511 F.3d 232, 237 (1st Cir. 2007) ("Credibility issues are for the jury . . . .").

Mrs. Kennedy, entered the courtroom and interrupted Assistant District Attorney (ADA) Gerald Pudolsky mid-argument. The facts surrounding this event are disputed. In essence, it is McDonald's and Shea's contention that McDonald called Shea and told him about the DNA exclusion of Burke, thereby leading Tpr. Shea to interrupt ADA Pudolsky. At trial, however, Burke marshaled evidence, discussed in detail below, suggesting that the results of the DNA test were never communicated from Tpr. McDonald to those responsible for prosecuting the arraignment hearing, or to the presiding magistrate.

In any event, it is undisputed that after Tpr. Shea interrupted the arraignment and spoke to ADA Pudolsky, ADA Pudolsky was left with the impression that "some evidence" had "come to light." He requested a recess, called his supervisors, and was told (he does not remember by whom) that "more testing" of the DNA was required before any definitive result could be obtained. ADA Pudolsky then sought and secured Burke's detention without bail. Burke spent the next forty-one days in custody until, after palm prints provided by Burke pursuant to court order revealed that Burke was not the source of a palm print on the victim's body, the district attorney filed a nolle prosequi in the case on the ground that Burke's prosecution was premature.

## B. The Instant Litigation

Burke subsequently filed a civil rights action in state court against the Town of Walpole, the dentist who provided the non-DNA bite mark analysis, and various officers and supervisors of the Walpole Police Department in their individual and official capacities. In addition to a § 1983 claim, he claimed defamation based on having been publicly identified as Mrs. Kennedy's murderer. Shortly thereafter, Burke filed a similar lawsuit in federal court against various Massachusetts State Police troopers, employees of the Massachusetts Chief Medical Examiner's Office, and the Commonwealth of Massachusetts. After the state case was removed to federal court, Burke amended his complaint to combine the two cases, and then amended his complaint two more times to add claims of negligence against the Commonwealth and to join a second dentist as a defendant. His attempt to amend the complaint a fourth time was denied.

In time, the district court granted summary judgment to all defendants on all claims, and Burke appealed. As noted above, we affirmed the district court in every respect except for one: we vacated the grant of summary judgment to Tpr. McDonald on Burke's § 1983 claim alleging a Fourth Amendment violation, concluding that "the record contains evidence, sufficient to create a jury question, that he intentionally or recklessly withheld exculpatory DNA evidence from the magistrate who issued the warrant to arrest

-6-

Burke, and a reasonable officer would know that such conduct violated a clearly established Fourth Amendment right." Burke I, 405 F.3d at 70.

Before, during, and after the ensuing trial, Tpr. McDonald maintained in the district court his position that he should not be found liable for damages incurred after the arraignment. In support of this position, Tpr. McDonald cited evidence, which he characterized as uncontroverted, suggesting that he had made a full disclosure of the exculpatory DNA evidence to the prosecution before ADA Pudolsky requested Burke's continued detention without bail. In McDonald's view, the district attorney, who after Tpr. McDonald's disclosure had all available information about the evidence inculpating and exculpating Burke, made a fully-informed and independent decision to ask for continued detention, and a fully-informed magistrate agreed. Tpr. McDonald argued to the district court, and maintains on appeal, that the arraignment therefore cut off the damages for which he can be liable, either as a matter of law or as a matter of fact.

The district court disagreed, and instead submitted the question to the jury as a matter of proximate cause and consequential damages. The court instructed the jury that "the plaintiff must establish the defendant's acts were the proximate cause of injuries to him and consequent damages sustained by him." Additionally, after defining and explaining the term "proximate

cause" and emphasizing that an intervening cause cuts off liability,[3] the court instructed:

> In this case it is the defendant's contention that even if he had withheld material information from other investigators on December 10th, he disclosed that the DNA testing had excluded Mr. Burke at the time of the arraignment on December 11th, so that any continued detention of Mr. Burke after that time could not have been caused by his withholding of information. That is also a factual issue for you to determine -- for you to resolve, if, of course, you find that Trooper McDonald had withheld information prior to the application for a warrant.

Before the jury retired, the district court held a sidebar discussion and invited objections and corrections to its instructions. Tpr. McDonald's attorney objected, to no avail, as follows: "Your Honor, just for the record, I wanted to state that I believe I'm entitled to as a matter of law instruction that the probable cause determination by the Court on the 11th terminates any exposure my client has to damages." This objection was in addition to an instruction that Tpr. McDonald had proposed, also to no avail, which would have instructed:

> [Y]ou may award [the Plaintiff] only such damages as will reasonably compensate him for such injury and damages as you find, from a preponderance of the evidence in the case, that he sustained from the time of his arrest until when the DNA results were disclosed. You are not permitted to award any damages you find the Plaintiff may have suffered following

---

[3]Tpr. McDonald has not challenged the district court's instructions as to the meaning of "proximate cause."

when the DNA results were disclosed by the Defendant.

The jury found in favor of Burke using a general verdict form, and a flurry of post-trial motions followed. Among them was Burke's request for attorneys' fees, originally in the amount of $324,859.75, but voluntarily reduced to $292,463.50 after a filing from Tpr. McDonald challenged the amount. The district court further reduced the fee award to $118,882.50, declaring the plaintiff's success "decidedly partial." In arriving at this amount, the district court depended heavily on the fact that the plaintiff obtained a jury verdict against "only one of twenty-one defendants on only one of sixteen causes of action."[4]

As for the amount of the reduction, the district court described the time and billing records as providing "little, if any basis for determining what work reflected in them was done to develop what claims," and therefore made a "proportional estimate" that, prior to Burke I, "it is fair to estimate that 15% of the . . . work was of direct or indirect benefit to the plaintiff's

---

[4]The court also awarded $12,632.89 in total expenses, an amount arrived at by way of the same global eighty-five percent reduction that was applied to the claimed attorneys' fees. It is unclear whether Burke intends his cross-appeal to encompass the district court's decision to reduce the expenses: except for a few passing references to costs, the brief complains only of the "fees" reduction and refers only to "time" records and "time spent"; not surprisingly, Tpr. McDonald takes the position that Burke has made "no argument challenging . . . the reduction of costs." But the matter is immaterial to our decision, for to the extent it has been appealed, we affirm the district court's reduction of expenses for substantially the same reasons we affirm its fee award.

ability to prevail on his [successful] claim against McDonald." The district court recognized only 15% of the claimed pre-Burke I hours, added them to the hours spent on the case after Burke I (100% of which were recognized), and proceeded to calculate the final award using the "lodestar method."[5] Both parties appealed.

## II.  TPR. MCDONALD'S APPEAL

The gravamen of Tpr. McDonald's appeal is simply put: he believes that his liability is limited to the damages Burke incurred between the arrest and the arraignment.  He advances this position with three related arguments.  First, he argues that the district court should have cut off the damages as a matter of law with a legal ruling before trial, an instruction to the jury not to consider damages incurred after the arraignment, a post-trial judgment as a matter of law, or a remittitur.[6]  Second, Tpr. McDonald argues that even if the district court was theoretically correct in framing McDonald's potential liability for post-arraignment damages as a question of proximate cause, in this case the prosecutors' informed and independent decision to proceed with

---

[5]The "lodestar method" of calculating attorneys' fees awards requires the district judge to multiply the number of hours productively expended by counsel by a reasonable hourly rate.  See De Jesus Nazario v. Morris Rodriquez, 554 F.3d 196, 207 (1st Cir. 2009).  The resulting amount is presumptively reasonable, Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992), although the district court enjoys some discretion to adjust the lodestar amount upwards or downwards, see De Jesus Nazario, 554 F.3d at 207.

[6]McDonald's challenge to the size of the verdict stands or falls on his intervening cause argument.

the arraignment should have cut off his damages as a matter of law. Third, Tpr. McDonald argues that the evidence of his liability for post-arraignment damages was insufficient on any theory to support the jury's verdict.

### A. Standards of Review

"We review the district court's denial of a motion for judgment as a matter of law, including legal decisions made therein, de novo." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009) (citing Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, 22 (1st Cir. 2006)). We review the denial of a motion for a new trial or remittitur for abuse of discretion, and "[w]e will order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice." Marcoux v. Shell Oil Prods. Co., 524 F.3d 33, 40 (1st Cir. 2008) (internal quotation marks omitted); see also Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 46 (1st Cir. 2009) ("Where . . . defendants have timely moved for a new trial or remittitur under Federal Rule of Civil Procedure 59, our inquiry is limited to determining whether the trial court abused its discretion in refusing to set aside the verdict as excessive." (internal quotation marks omitted)).

"As to matters of fact, we view the evidence in the light most favorable to the verdict, asking only whether a rational jury could on the basis of that evidence find as the jury has." Id. In

-11-

other words, "a jury's verdict and factual findings must be upheld unless the facts and inferences viewed in the light most favorable to the verdict point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict." Mass. Eye & Ear Infirmary, 552 F.3d at 57 (internal quotation marks omitted); see also Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393 (1st Cir. 2002).

Where, as here, a claim of instructional error challenges the very basis for instructing or refusing to instruct on a particular subject, we review that claim of error de novo. Davignon v. Hodgson, 524 F.3d 91, 108 (1st Cir. 2008) (citing Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 76 (1st Cir. 2002)); United States v. Nascimento, 491 F.3d 25, 33 (1st Cir. 2007). "Where a district court refuses to give a party's requested instruction, however, we will reverse only if the requested instruction was '(1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point of the case.'" Id. (quoting White v. N.H. Dep't of Corr., 221 F.3d 254, 263 (1st Cir. 2000)).

"We will uphold a jury award if it is a result of 'any rational appraisal or estimate of the damages that could be based on the evidence before the jury.'" Marcoux, 524 F.3d at 40

(quoting Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1172 (1st Cir. 1994)).

## B. Discussion

For his argument that the district court should have limited his liability for damages to the period preceding the arraignment, Tpr. McDonald relies primarily on the Supreme Court's statement in Heck v. Humphrey that "'If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but no more.'" 512 U.S. 477, 484 (1994) (quoting W. Page Keeton et al., Prosser and Keeton on Law of Torts 888 (5th ed., 1984)). The appellant correctly acknowledges, however, that an exception to that rule exists where facts are withheld from the prosecutor or judge such that the affected official(s) cannot be understood to have exercised an informed, independent judgment. See Wagenmann, 829 F.2d 196, 211 (1st Cir. 1987) (observing, in action against police officer for violating, inter alia, right to be free from excessive bail, "if a person wrongfully brings about an end by manipulating another," in this case the court clerk responsible for setting the bail, "the naked fact that he lacked . . . authority to accomplish the end by himself does not provide an impenetrable shield" against damages); see also, Harper v. City of Los Angeles, 533 F.3d 1010, 1027 (9th Cir. 2008) (citing Smiddy v. Varney, 665 F.2d 261, 266 (9th Cir. 1981)) (prosecutor's decision to proceed does not cut off

investigating officers' liability where plaintiff can show that the prosecutor was pressured or caused by the investigating officers to act contrary to his independent judgment); Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999); Jones v. City of Chicago, 586 F.2d 985, 994 (7th Cir. 1988). Thus, bearing in mind the applicable standard of review, Tpr. McDonald's appeal of the district court's refusal to enter judgment as a matter of law must fail if, when viewing the facts and drawing inferences in the light most favorable to the verdict, a rational jury could have found that Tpr. McDonald withheld the exclusionary DNA test results from the prosecutors and the magistrate in a manner that prevented those officials from making informed and independent decisions.[7]

On the record before us, no stretch of imagination is required to fathom how a rational jury could have so found. For instance, the jury could have credited the testimony of Walpole

---

[7]In their briefs, the parties debate whether an independent Fourth Amendment malicious-prosecution claim is cognizable under § 1983, an open question in this circuit. See Nieves v. McSweeney, 241 F.3d 46, 54 (1st Cir. 2003) ("It is an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation."). We need not reach that question here; it suffices to repeat that "the essential elements of actionable section 1983 claims derive first and foremost from the Constitution itself, not necessarily from the analogous common law tort." Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 4 (1st Cir. 1995); id. at 5 (Lynch, J., concurring) (same); cf. Albright v. Oliver, 510 U.S. 266, 270 n.4 (1994) ("[T]he extent to which a claim of malicious prosecution is actionable under § 1983 is one on which there is an embarrassing diversity of judicial opinion." (internal quotation marks omitted)).

Police Officer James Dolan, called by Burke as a hostile witness, that the information presented to the magistrate at the arraignment did not include the exculpatory DNA test results that, according to Calicchio, had already been tendered to Tpr. McDonald. The jury could also have disbelieved Tpr. McDonald's testimony that he fully informed the prosecutors involved in the bail decision about the DNA test results. Tpr. McDonald claimed to have unburdened himself to First Assistant District Attorney John Kivlan directly on the day of the arraignment, but ADA Kivlan was never called to testify, nor was any other evidence offered to support McDonald's assertion.

The jury might well have determined that Tpr. McDonald's testimony was nakedly self-serving and not credible. Tpr. McDonald also claimed to have informed ADA Pudolsky of Burke's exclusion by way of Tpr. Shea, who testified that he told ADA Pudolsky that Burke was excluded when he interrupted the arraignment. But the rest of the evidence does not fully corroborate that account. Among the infirmities in Tpr. McDonald's version of events is the fact that, while both Tprs. McDonald and Shea testified that Tpr. McDonald told Tpr. Shea that "Burke is excluded" based on the DNA test results, and while Tpr. Shea testified that he passed this message on to ADA Pudolsky, ADA Pudolsky testified that Tpr. Shea only told him to "go downstairs and call" his supervisors, leaving ADA Pudolsky with the impression that there was "some evidence" that had "come to light." ADA Pudolsky did not testify that Tpr.

Shea told him that Burke was excluded, nor did he testify that Tpr. Shea so much as mentioned DNA or test results to him. The gap between these two versions of this chain of events -- Tprs. McDonald and Shea's version on the one hand, and ADA Pudolsky's on the other -- was wide enough to accommodate the inference that Tpr. McDonald did not, in fact, unburden himself to the prosecution by way of Tpr. Shea.

Other evidence before the jury bolstered this inference, such as the fact that ADA Pudolsky, after phoning his supervisors, argued to the magistrate that the DNA test results were ambiguous as to Burke's culpability, a position he would have been unlikely to adopt had he heard Calicchio's opinion, which she said she rendered to Tpr. McDonald the previous day, that the DNA test results unquestionably excluded Burke. The jury also heard that Tprs. Shea and McDonald were colleagues and that both participated in the investigation and arrest of Burke, thus providing at least some basis for the jury to infer that the two troopers might have had untoward incentives or inclinations to corroborate each other's testimony. When taken together, these additional facts could reasonably have led the jury to discount Tprs. McDonald's and Shea's testimony about what disclosures Tpr. McDonald made to whom, and when.[8]

---

[8]As a postscript to our discussion of this evidence, we briefly note that Calicchio testified at trial that, the day before the arraignment, she spoke to Robert Martin, a chemist for the

None of the evidence just described leads inexorably to the conclusion that Tpr. McDonald failed to disclose the DNA test results to the prosecution, but we need no such certainty to reject McDonald's argument that his liability for damages must end, as a matter of law, when the prosecutors weighed in at the bail hearing. All that is required is a finding that, when these facts are viewed in the light most favorable to the verdict, a rational jury could have found that Tpr. McDonald failed to disclose what he knew, and that this failure prevented the magistrate and prosecutors from making informed, independent judgments. The evidence discussed above supports that finding.[9]

_____

Massachusetts State Police Crime Laboratory, and that during this conversation she may have advised him that Burke was excluded. She also testified that, on the day of the arraignment, she spoke to Richard Iwanicki, then a forensic chemist with the Massachusetts State Police, and that in the context of discussing the specific procedures used in the DNA tests, she did in fact advise him of Burke's exclusion. What was said between Calicchio, Martin, and Iwanicki, and whether those discussions sufficiently broke the chain of causation between Tpr. McDonald's failure to disclose what he knew of the DNA test results and Burke's eventual damages, were, for the reasons provided herein, questions appropriately left to the jury.

[9]This is so even assuming -- without deciding -- that Tpr. McDonald is correct to assert that the "presumption of regularity" that often attaches to a prosecutor's charging decision in the context of retaliatory-prosecution actions, see Hartman v. Moore, 547 U.S. 250, 263 (2006), could also attach to the prosecutors' decision at the arraignment to seek Burke's continued detention in this case. In light of the exclusionary DNA test results already in Tpr. McDonald's hands, probable cause to detain Burke was lacking, see id. at 265 (describing "the significance of probable cause or the lack of it" as one fact having "obvious evidentiary value" when determining liability in the context of prosecutorial decisions urged by investigating officers); moreover, probable

-17-

None of Tpr. McDonald's other arguments in support of his appeal fare better. We find no cognizable error in the district court's jury instructions, which framed the question of damages as a matter of proximate cause. This approach to the issue is consistent with Supreme Court precedent emphasizing that liability under § 1983 flows against the defendant for all damages that are the "natural consequences of his actions." Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)) (internal quotation marks omitted).

Indeed, in Wagenmann we upheld a jury verdict against a police officer who manipulated the independent and informed decisions of judicial officers after the jury instructions had put the question of damages in terms of causation. 829 F.2d at 211-13. In so doing, we noted that "[t]he law looks to causation in fact" when assessing damages, id. at 211, and that the evidence supported "the finding that [the defendant officer] proximately caused bail to be set," id. at 212 (emphasis added). We also emphasized that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions," id. (quoting Monroe, 365 U.S. at 187), and endorsed "the use of traditional tort principles for making intervening cause

---

cause aside, the jury could easily have inferred from the evidence described above that the prosecutors' decision was in fact influenced by Tpr. McDonald's failure to disclose the DNA test results.

determinations in the § 1983 milieu," id. (citing Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987)).

The district court's instructions were correct as a matter of substantive law. They properly and clearly explained the concept of proximate causation, and plainly and concretely committed the question of whether Tpr. McDonald disclosed the DNA test results to the prosecution at the time of the arraignment to the judgment of the jury. The instructions also substantially incorporated Tpr. McDonald's position that, so long as he timely disclosed the DNA test results to the prosecution, he should not bear liability for damages after the arraignment. The instructions therefore were not erroneous.

For similar reasons, we are unpersuaded by Tpr. McDonald's argument that the district court's decision to allow evidence on the conditions of Burke's post-arraignment confinement so confused the jury as to taint the damages award. The jury was instructed not to consider this evidence if it found that Tpr. McDonald disclosed the DNA test results to the prosecutors at the time of the arraignment, and we presume that the jury understood and followed those instructions. See Mass. Eye & Ear Infirmary, 552 F.3d at 58 n.12 (citing United States v. Griffin, 524 F.3d 71, 78 (1st Cir. 2008)); see also id. at 73 ("Where, as here, the jury heard a legally adequate instruction, which was supported by

competent evidence, we will not assume jury confusion or verdict taint.").

Moreover, while we think it most plausible to infer that, as explained above, the jury disbelieved Tprs. McDonald's and Shea's assertions that Tpr. McDonald informed the prosecutors about the DNA test results, we also recognize an alternative possible basis for the jury's award: that the jury awarded damages to cover only the natural consequences of the false arrest which, as Burke argues in his brief on appeal, did not "come to a screeching halt in [the] twenty four . . . hours" between the arrest and the arraignment.

In light of our precedent, discussed below, the evidence at trial may be viewed as providing an adequate basis for the jury to award significant damages against Tpr. McDonald for his role in Burke's arrest. Given the heinousness and visibility of the crime at issue, Burke's arrest attracted a significant amount of public attention. Burke testified at trial to having seen the scene develop outside his house on the day of his arrest. He described looking out the window in the morning and seeing police "everywhere," including what he believed to be unmarked observation vans in the parking lot. He also described hearing a helicopter "circling the house." By lunchtime, Burke said that he saw people other than police "gathering on the sidewalk and across the street," perhaps as many as one hundred or more, some with cameras.

Thereafter, the police, including Tprs. Shea and McDonald and Officer Dolan, entered Burke's house by breaking in through the back door, arrested him, and led him handcuffed into the street wearing a "torn, crummy tee-shirt that was on inside out."

At trial, after a videotape of Burke's walk into the street was published to the jury, Burke described the reaction of the bystanders as sounding "sort of like the 4th of July with floats going by, people clapping, you know, when you're in a parade." He described a television reporter who "stuck a microphone in [his] face and asked [him] if [he] murdered Mrs. Kennedy." He also testified to his knowledge -- acquired later -- of newspaper and television news stories that publicized his arrest for the murder, saying, "Every video media, every TV station in Boston and Cable News New England was there. Every newspaper was reporting: the Herald, the Transcript, the Walpole Times, the Globe."

Burke also described his experience being held that night in a "very small" cell at the police station that was equipped with little more than "a short wooden thing that you could sit on." He testified to hearing another inmate say from an adjacent holding cell at the courthouse the next day that the suspect in Mrs. Kennedy's murder (at that point, Burke) is "not going to last long" in prison, and that the suspect should be executed. He also testified to his humiliation at the prospect of being led into a

public arraignment hearing in handcuffs, chains, and ankle bracelets, an event that eventually occurred.

Burke's qualitative assessments of the impact of these events on his life emphasized the extent of his mental and emotional anguish. He described feeling like his house was a "pressure cooker" as the police and bystanders gathered outside on the day of his arrest, making him "very tense." Of his anxiety leading up to the arraignment hearing, he stated, "I thought it was the end of my life. It was something that I didn't think there was any way that I'd be able to deal with. . . . I didn't think I could get through what I was about to face. . . . It was too humiliating." Of the publicity surrounding his arrest, Burke said simply, "It destroyed my life. It destroyed my life," and elaborated by pointing out that the articles had portrayed him not just as a murderer but also an "abuser," "weirdo," and "loner," labels which clearly and understandably upset him. On multiple occasions during his testimony, Burke hesitated to describe the full extent of his ordeal, stating that he was being asked to describe events that were uncomfortable for him to think about.

The jury was also presented with evidence that Burke's emotional and mental anguish had potentially long-lasting effects. Burke testified that he lost friends at the time of the arrest "because they didn't want to be associated with what was about to come down." Burke's brother also testified that Burke's reputation

in the Walpole community prior to the arrest was as a "gentle, kind, animal lover, non-violent," and juxtaposed it with a more recent event he had witnessed in Burke's new home town in another state, during which a stranger yelled the word "murderer" at Burke from a passing car. Burke's brother also contrasted Burke's pre-arrest personality, which he described as including "a great sense of humor," with his post-arrest personality, which he described as "tearful, hopeless, despondent, enraged," and observed that, post-arrest, Burke "focused all his mental . . . activity to try and understand how and why this happened to him. . . . [I]t engulfed his life." If the jury awarded damages to compensate Burke for his trauma, there is a basis for concluding that it was entitled to do so: the jury was presented with adequate evidence upon which to base the award, it was properly instructed as to the circumstances under which such damages are compensable, and it was entitled to make the award as a matter of law. See, e.g., Wagenmann, 829 F.2d at 215-16 (upholding a jury award based on "the stress, fear, humiliation, embarrassment, anguish, and stigmatization" that a defendant "suffered (and continues to suffer)" after his arrest without probable cause).

In sum, we discern no error of law by the district court when it refused to cut off damages at the moment of arraignment or when it instructed the jury as to Tpr. McDonald's liability for damages. We further find that the jury's award can fairly be

understood to be supported by at least one and probably two rational appraisals of the damages. We therefore have no cause to conclude that the district court abused its discretion in denying the motions for a new trial and remittitur, nor reason to upset the verdict ourselves.

## III. BURKE'S CROSS-APPEAL

Burke's cross-appeal mounts two challenges to the district court's attorneys' fees award. First, Burke argues that the district court erred in declaring Burke's victory "decidedly partial," given that he ultimately secured a jury verdict in the amount of $400,000 on his § 1983 claim. Burke acknowledges, of course, that many of his claims were unsuccessful, but he argues those claims were so inseparable from the successful claim that "each and every minute spent was necessary to the actual verdict." Second, Burke characterizes the district judge's decision as an adjustment to the lodestar amount based on the "results obtained," and argues that the district court erred in so doing by considering Burke's claim-by-claim success without also considering "the relief actually achieved" and the "societal importance of the right which has been vindicated."[10]

_____

[10]Burke's challenge relates only to the district court's calculation of recognizable hours; he does not challenge the district court's findings regarding appropriate hourly billing rates.

-24-

### A.  Standard of Review

District courts are provided broad discretion to make fee determinations, and we consequently review the denial in whole or in part of a motion for attorneys' fees for manifest abuse of discretion.  Boston's Children First v. City of Boston, 395 F.3d 10, 13 (1st Cir. 2005).  "Apart from mistakes of law -- which always constitute abuses of a court's discretion -- we will set aside a fee award only if it clearly appears that the trial court ignored a factor deserving significant weight, relied upon an improper factor, or evaluated all the proper factors (and no improper ones), but made a serious mistake in weighing them."  Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292-93 (1st Cir. 2001) (citations omitted).

The party claiming attorneys' fees bears the burden of proving the reasonableness of the hours it claims.  Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 340 (1st Cir. 2008).  "If the fee-seeker properly documents her claim and plausibly asserts that the time cannot be allocated between successful and unsuccessful claims, it becomes the fee-target's burden to show a basis for segregability," although "[i]n reviewing determinations that claims are or are not interrelated for purposes of an award of attorneys' fees, we have exhibited great deference to the trial court's discretion."  Lipsett, 975 F.2d at 941.  For purposes of this case, we note also that we repeatedly have warned that time entries that

amount to no more than "gauzy generalities" will be "substantially discounted," id. at 938, and that the failure of a fee-seeker to submit reasonably explicit time records may have "dire consequences" on the amount of fees awarded. Gay Officers, 207 F.3d at 297.

## B. Discussion

In light of the limits of our review, we conclude that the district court's fee reduction should be affirmed. It is well-established that "fees are appropriately excluded from the lodestar . . . 'when different claims for relief are not interconnected, that is, when the claims rest on different facts and legal theories.'" Bogan v. City of Boston, 489 F.3d 417, 428-29 (1st Cir. 2007) (quoting Figueroa-Torres v. Toledo-Davila, 232 F.3d 270, 278 (1st Cir. 2000)). Excluding fees for unsuccessful claims not interconnected with the successful claim is precisely what the district court did in this case: in calculating the number of hours to recognize for purposes of its lodestar calculation, it distinguished Burke's successful § 1983 claim against Tpr. McDonald from his other, unsuccessful claims, each of which was made against other defendants, premised on significantly different legal theories, or both. For instance, the district court noted that whereas "the jury verdict against Trooper McDonald was supported by evidence that he, being the only investigating officer aware of exculpatory DNA evidence prior to the plaintiff's arrest, knowingly

withheld that information from others who were applying for the arrest warrant" (emphasis added), Burke's lawsuit included unsuccessful claims that other officers executed his arrest without a validly issued warrant, that other defendants mishandled DNA evidence, and that other defendants had withheld or misstated non-DNA evidence bearing on probable cause (such as the bite mark evidence). The district court further noted that Burke brought "completely distinct claims . . . against forensic odontologists," and a separate defamation claim against the Walpole police chief for statements he made to the news media about the arrest. While acknowledging that "the multiple and varied claims asserted were all related in a very broad sense – they all pertained to the events that culminated in Burke's arrest," the district court nonetheless concluded "that preparation of the successful case against McDonald did not benefit from legal efforts expended in pursuit of theories based on different facts against different defendants," and it thus decided to exclude the hours Burke's attorneys spent on unsuccessful claims from the lodestar calculation.

The only wrinkle in this case is the manner in which the district court calculated the number of hours that were so unrelated to the successful claim as to be excludable from the lodestar calculation, to wit, a global reduction of eighty-five percent to the pre-Burke I hours based on the district court's

"proportionate estimate." To be sure, a more exacting approach to the lodestar method is preferred, but this case did not allow for more precision: as the district court noted after providing examples of the ambiguous time entries contained in the time and billing records ("strategy meeting" and "telephone conference"), those records provided "little, if any, basis for determining what work reflected in them was done to develop what claims," and, despite the fact that he bore the burden to prove the reasonableness of the hours he claimed, Burke did not provide an affidavit explaining with sufficient detail how the line item entries -- or even categories of line item entries -- were related to the meritorious claim. Therefore, under the circumstances, we cannot conclude that a global reduction based on a proportionate estimate of the time spent on the meritorious claim constituted error.

On the contrary, it was the best approach available to the district court, and it was consistent with Burke's burden to prove his hours. See Hensley v. Eckerhart, 461 U.S. 424, 436-37 (1983) (noting that the district court, in reducing amount of fees calculated by the lodestar method, "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for . . . limited success"); see also Torres-Rivera, 524 F.3d at 336 (permitting district courts, when computing the lodestar amount, to "discount or disallow" hours when time

records are "too generic and, thus, insufficient as a practical matter to permit a court to answer questions about excessiveness, redundancy, and the like"); cf. Lipsett, 975 F.2d at 941 ("If the fee-seeker properly documents her claim and plausibly asserts that the time cannot be allocated between successful and unsuccessful claims, it becomes the fee-target's burden to show a basis for segregability." (emphasis added)).

Burke's arguments to the contrary are all unpersuasive. His argument that the district court failed to consider the "the relief actually achieved" and the "societal importance of the right which has been vindicated" is based on an incorrect premise: the district court's use of phrases suggesting an "adjustment of the whole-case lodestar" notwithstanding, it is apparent from the district court's order that it considered Burke's claim-by-claim success in an attempt to estimate the reduction in hours when calculating the lodestar amount, not as part of a reduction to that amount. Our prior statements encouraging district courts to consider the relief achieved and the societal importance of the right, see e.g. De Jesus Nazario, 554 F.3d at 206 n.13, 207; Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331, 338 (1st Cir. 1997), were made in the latter context, not the former.

More importantly, under the circumstances of this case, the district court was faced with the task of estimating which hours were necessary and sufficiently related to the successful

claim and which hours were not for purposes of the lodestar calculation.  A claim-by-claim analysis of the case was necessary to reach that end; considerations of the relief obtained and societal importance were not.  If those considerations had a place in the district court's analysis, it would have been when considering whether to adjust the lodestar amount upward or downward, not when calculating it in the first instance.[11]

Finally, we note that the size of the district court's global reduction under these circumstances -- eighty-five percent of the pre-Burke I fees, which amounts to a nearly sixty-percent reduction to the overall fee request -- is unquestionably substantial.  Reasonable minds could differ about whether some of the claims against other defendants, or some of the mishandling or

---

[11]After computing the lodestar, the district court would have been within its discretion to consider an adjustment -- upward or downward -- based on the results obtained by taking into account Burke's claim-by-claim success, the relief obtained, and the societal importance of the right vindicated.  That the district court appears not to have done so, however, is of no moment under the circumstances, for two reasons.  First, Burke has not argued on appeal that the district court's decision not to consider such an adjustment constituted error, and therefore the argument is waived.  Second, the burden of proving that an upward adjustment is necessary to the determination of a reasonable fee is on the fee applicant.  Blum v. Stenson, 465 U.S. 886, 898 (1984).  Although Burke made mention of an upward adjustment in his affidavit accompanying his motion for attorneys' fees, that affidavit also included what could be understood as an abandonment of the request when it acknowledged that "enhancements are rarely allowed" and advocated for the district court to award "the actual contemporaneously recorded time-slips."  In any event, nothing in the record compels us to find that Burke proved the necessity of an upward enhancement, or that the district court erred by not considering one.  See, e.g., id. at 898-902.

withholding of evidence claims, were sufficiently interrelated with the ultimately successful claim against Tpr. McDonald. Reasonable minds might also doubt that the pre-Burke I fee award, which amounts to just $28,050 for the period of 1999 through 2005, adequately recognizes the undoubtedly significant attorney time required to develop the facts underlying the successful claim against Tpr. McDonald. But our limited review for manifest abuse of discretion in the attorneys' fees context is designed to defer to the district court in the face of such disagreements, and this is particularly the case when, as here, the fee application is insufficiently documented and insufficiently explained.

**IV. CONCLUSION**

For the reasons provided above, we **AFFIRM** the decisions of the district court.