**Stephen F. FRYER, Plaintiff,**

v.

**A.S.A.P. FIRE AND SAFETY CORPORATION, INC., Joseph Sheedy and Brian Cote, Defendants.**

**Civil Action No. 09–10178–MBB.**

United States District Court, D. Massachusetts.

Jan. 25, 2010.

Brian T. Akashian, Law Offices of Kevin J. Murphy, Kevin J. Murphy, Attorney at Law, Chelmsford, MA, for Defendants.

Jonathan H. Meyer, Backus, Meyer, & Solomon, Manchester, NH, Nancy A. Richards–Stower, Law Offices of Nancy Richards–Stower, Merrimack, NH, for Plaintiff.

*MEMORANDUM AND ORDER RE: DEFENDANT A.S.A.P. FIRE AND SAFETY CORPORATION, INC.'S, DEFENDANT JOSEPH SHEEDY'S AND DEFENDANT BRIAN COTE'S MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59 OR, IN THE ALTERNATIVE, FOR REMITTITUR (DOCKET ENTRY # 41)*

BOWLER, United States Magistrate Judge.

On November 24, 2009, after hearing five days of testimony, the jury returned a verdict in favor of plaintiff Stephen F. Fryer ("plaintiff"), a member of the Massachusetts National Guard. In May 2008, plaintiff returned home after serving in Iraq to find his preservice position inspecting, servicing and selling sprinkler systems for defendant A.S.A.P. Fire and Safety Corporation, Inc. ("ASAP") no longer available. ASAP eventually rehired plaintiff in late June 2008 in a sprinkler helper position which lacked certain benefits of his preservice position. In October 2008, ASAP fired plaintiff ostensibly for being late to work on two occasions and calling in sick on three occasions.

ASAP and defendants Joseph Sheedy ("Sheedy") and Brian Cote ("Cote")[1] (collectively: "defendants") filed a motion for a new trial or, in the alternative, a remitti-

---

1. The parties stipulate that Sheedy and Cote each own 50% of ASAP.

tur of the jury's $505,748 verdict[2] under Rule 59, Fed.R.Civ.P. ("Rule 59"). (Docket Entry # 41). Plaintiff opposes the motion on various grounds (Docket Entry ## 48 & 49) including the motion's failure to identify any reason to allow a new trial or a remittitur. (Docket Entry # 48, ¶ 9).

The motion challenges the verdict as against the weight of the evidence and the damages awarded as excessive. It does not, however, identify any fact, any evidence, any legal error or any particular award as grounds for the motion. Instead, the three sentence motion, filed without a supporting memorandum, proffers the following reasons for ordering a new trial or a remittitur:

1. The jury verdict is contrary to the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice;

2. The damages awarded are outrageously excessive, so as to shock the judicial conscience and raise an irresistible inference that passion, prejudice, or some other improper cause impaired the jury's decisionmaking; and

3. That prejudicial error occurred.

(Docket Entry # 41). Without elaboration, defendants move for a new trial or a remittitur "on all the law, the evidence and the pleadings." (Docket Entry # 41).

After voluntarily dismissing certain counts in the amended complaint, plaintiff proceeded to trial on claims that defendants violated the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4311 et seq. ("USERRA"), by failing to reemploy him in his preservice position, discriminating and retaliating against him because of his military service and terminating him because of his military service. Plaintiff also alleged discriminatory and retaliatory treatment on the basis of his military service under chapter 151B. Finally, plaintiff brought claims for denying him definitely determinable sales commissions in violation of section 148 of Massachusetts General Laws chapter 149 ("chapter 149") and overtime wages in violation of sections 1A and 1B of Massachusetts General Laws chapter 151 ("chapter 151").

With the exception of not finding liability on the part of Sheedy and Cote for lost overtime, the jury found in plaintiff's favor on all claims. In answer to a 31 question verdict form, the jury found defendants liable on the discrimination, retaliation, reemployment and discharge claims under USERRA. The jury awarded plaintiff back pay, consisting of lost wages and benefits, in the amount of $42,234. It also found that each defendant acted wilfully which, agreeing with the finding, results in doubling the award. The jury also found defendants liable on the two chapter 151B claims for discrimination and retaliation. Adhering to the instructions not to award compensatory damages more than once for the same injury, the jury did not award back pay under chapter 151B but did award front pay in the amount of $105,000 and emotional distress damages in the amount of $289,000. The jury also awarded $5,260 as compensation for earned commissions[3] and $4,240 as compensation for lost overtime.

### FACTUAL BACKGROUND

Plaintiff, a 43 year old high school graduate who attended two semesters of col-

---

2. The above figure does not include a prejudgment interest award on an emotional distress damages award under Massachusetts General Laws chapter 151B ("chapter 151B").

3. The jury awarded $610 for commissions earned before July 13, 2008, and $4,650 for commissions earned after July 13, 2008. The total of the two figures is $5,260.

lege, obtained a fire sprinkler inspection certificate in December 2004. He initially worked as a sprinkler helper and then as a sprinkler fitter at various companies before joining ASAP in January 2006.

At ASAP, plaintiff worked servicing and installing sprinkler systems. His duties gradually evolved to focus more on sales and service. By the start of 2007, his salary had increased from $17 to $19 an hour and he enjoyed a company vehicle, telephone and business card. In addition to the hourly base rate of pay, plaintiff received 10% commissions on sales of new equipment or new service of sprinkler systems that resulted in a new account. The company vehicle helped plaintiff make sales and, together with a company gas card, reduced his commuting cost. Plaintiff loved his job and proved very successful in the sales aspect of it.

At the February 15, 2007 yearly kick off meeting, he received commendation and recognition for his sales work. He generated a plethora of sales (Ex. 5) and by the time he left for Iraq approximately 25% of his compensation came from commissions. Plaintiff's economics expert, Arthur M. Kenison, Ph.D. ("Kenison"), a professor of economic and business at St. Anselm College in Manchester, New Hampshire, testified that plaintiff earned a 51 week average of $1,010 per week in 2006. After benefits, plaintiff's lost wages amounted to $42,110 in 2006, according to Kenison.

In January 2007, plaintiff accepted an offer to reenlist in the Massachusetts National Guard out of a sense of duty as well as for the health and pension benefits. He did not expect to be deployed to Iraq. Shortly after reenlisting, he spoke to William Plamondon ("Plamondon"), ASAP's Sales and Service Manager during the relevant time period, and explained it would not effect his work and only involve weekends.

On February 17, 2007, however, the Massachusetts Army National Guard issued a deployment letter for plaintiff. Plaintiff provided Plamondon with the letter a few days after the February 15, 2007 yearly kick off meeting. Plaintiff also spoke with Sheedy and Cote and notified them about his impending deployment. Thereafter and prior to his deployment, ASAP slowed or withheld payment of certain commissions. On April 17, 2007, the Massachusetts National Guard issued an order requiring plaintiff to report for active duty on May 1, 2007. Plaintiff reported for active duty on May 1 and left for training camp a few days later. Expecting to return to ASAP, he left a set of tools in Plamondon's office. In July 2007, plaintiff went to Kuwait and thereafter Iraq.

During his military service, plaintiff telephoned Plamondon once and sent him an email in late April 2008. The April 23, 2008 email notified Plamondon that plaintiff should be back by the end of May and was looking forward to seeing everyone. During his military service, plaintiff also expected ASAP would pay the overdue commissions to his wife, who remained at home with their children. ASAP had not made the payments.

On May 7, 2008, plaintiff arrived home positive, upbeat and very excited to be back. Looking forward to returning to the job he enjoyed, he stopped by ASAP's office and spoke to Plamondon the same day. When plaintiff told Plamondon he was available to start work on May 12, 2008, however, Plamondon said there were no openings but he would consult with Sheedy and Cote and get back in touch with plaintiff. During plaintiff's deployment, ASAP hired another individual, Matthew Tapley ("Tapley"), to work in plaintiff's stead. According to Plamondon, if plaintiff had not been activated, Tapley

would not have been hired.[4] Sheedy and Cote also purchased another sprinkler company during plaintiff's military service.

Plamondon did not get back in touch with plaintiff. After contacting the United States Department of Labor and the Employer Support of the Guard and Reserve, plaintiff sent ASAP a certified letter dated May 22, 2008, formally requesting reinstatement to his position. He advised ASAP that he planned to report to work on June 30, 2008, and directed ASAP to telephone him within seven days of receiving the letter to confirm the return date.

ASAP did not contact plaintiff until Plamondon telephoned plaintiff on Friday, June 27, 2008, instructing him to report to work on Monday, June 30, 2008. Plaintiff arrived at work on Monday and spoke to Plamondon. Plamondon advised plaintiff that ASAP had to give him a job. The job he offered, however, was not an "escalator" position or plaintiff's preservice position or a position of like seniority, status and pay.[5]

In particular, Plamondon offered plaintiff a position as a sprinkler helper, a position that involved helping another sprinkler fitter. The $3 increase in hourly pay to $22 was because plaintiff no longer needed ASAP's health insurance, according to plaintiff. The new position lacked customer access as well as the opportunity to make commissions and sales [6] thereby reasonably resulting in a 25% loss of compensation in comparison to plaintiff's preservice position. Indeed, in contrast to the $9,292 in commissions earned in a 51 week period in 2006, plaintiff earned only $418 in commissions during the July to October time period he worked at ASAP in 2008. The new position also lacked a company vehicle, a company telephone and a company gas card, all of which plaintiff enjoyed in his preservice position.

Plaintiff accepted the position but continued to voice his desire to return to the position he had before his deployment. In addition to the loss of the company vehicle, telephone and gas card, the new position involved additional travel to transport another ASAP employee to and from work. Plaintiff did not receive additional compensation for the extra ten hours the transport required each week. ASAP also refused to pay plaintiff a commission for a new customer who placed a sizable order with the company.

In his new position, plaintiff reported to Gerald Goodwin ("Goodwin"). In late October 2008, Goodwin told plaintiff he was terminated. The October 22, 2008 termination notice identified the reasons for termination as "being late for work twice and calling out sick three times all with in a 30 day period." (Ex. 24). Plaintiff was shocked.

---

**4.** The relevant USERRA regulation provides that:

> the employer may not, however, refuse to reemploy the employee on the basis that another employee was hired to fill the reemployment position during the employee's absence, even if reemployment might require the termination of that replacement employee.

20 C.F.R. § 1002.139(a). Tapley remains employed at ASAP.

**5.** "A key provision of USERRA's reemployment protections is the 'escalator principle,'

which 'requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of [military] service.'" *Fannin v. United Space Alliance, L.L.C.*, 2009 WL 928302, *5 (M.D.Fla. April 3, 2009) (quoting 20 C.F.R. § 1002.191).

**6.** Any opportunity during lunch breaks or after hours is not like the opportunity plaintiff had in his preservice position.

Ample evidence supports viewing the reasons as pretextual with the real reason being plaintiff's military service and his complaints about not having the benefits and responsibilities of his preservice position. During the four months in the new position, plaintiff sought and obtained permission from Goodwin to leave work at 2 p.m. on July 23, 2008, in order to take his son to a police station. On another occasion, plaintiff refused to work overtime on a Saturday because he was attending a wedding.

Goodwin gave plaintiff permission to leave early on September 12, 2008, for Massachusetts National Guard duty. On September 24, 2008, plaintiff did not arrive at work until 10 a.m. because he had to put his children on the bus to school because his wife was at a hospital with her gravely ill mother. Plaintiff took one vacation day, approved by Goodwin, to undergo magnetic resonance imaging ("MRI") of a knee he injured in Iraq.[7] He was one hour late to work on October 6, 2008. Sick with the flu, plaintiff notified ASAP and did not come to work on October 20 and 21, 2008. ASAP did not request or require a doctor's note to support the absence.

The company's policy manual sets out a series of progressive disciplinary measures before terminating an employee. The company did not adhere to this policy when it terminated plaintiff. In addition, the company did not terminate the employment of another employee who was out sick four days during the week of October 20, 2008.

Additional evidence of discriminatory and retaliatory motives include comments by Sheedy and Cote at a July 2008 meeting that plaintiff left them in a lurch and they suffered because of it.[8] When plaintiff asked them why he did not get back his former position, he was told he needed to prove himself. In the context of plaintiff asking for more money and whether he expected the company to move Tapley, Cote told plaintiff on October 3, 2008, to stop asking and that it is "not going to f* * * * * * happen."[9]

Plaintiff's positive, upbeat attitude and self esteem, which he had when he returned from Iraq, deteriorated as a result of ASAP's failure to reinstate him in his previous position and the discrimination and retaliation he received because of his military service. He began to argue more often with his wife and avoid his children. After his termination, he grew more and more depressed and withdrew even more from his family. He began and continues to take antidepressant medication. He gained weight and experienced difficulty sleeping. Plaintiff's brother-in-law re-

**7.** A notation on the relevant weekly time sheet inaccurately reflects that plaintiff "was never approved" for the vacation day.

**8.** These are not the only derogatory comments in the record.

**9.** Defendants do not argue that the foregoing statements are hearsay. *See Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 260 (1st Cir.1999) ("district court is free to disregard arguments that are not adequately developed"). In any event, this court does not consider the comments for the truth of the matters asserted but instead as evidence of a discriminatory or retaliatory motive in the minds of these decision makers and/or as party admissions. *See Wright v. Southland Corporation,* 187 F.3d 1287, 1303–1304 & n. 21 (11th Cir.1999) (statements in age discrimination case "not being offered to prove the truth of the matters asserted (e.g., that Wright was too old to operate Southland's computers), but rather to prove the state of mind of the decisionmakers"); *Staniewicz v. Beecham, Inc.,* 687 F.2d 526, 530–531 (1st Cir.1982); *Troy v. Bay State Computer Group, Inc.,* 1994 WL 562591, *8 & n. 13 (D.Mass. Oct. 6, 1994); *see also Hatfield–Bermudez v. Aldanondo–Rivera,* 496 F.3d 51, 56 & n. 1 (1st Cir. 2007).

counted one occasion in which plaintiff visibly broke down after an argument with his wife. His repeated and active attempts to obtain work over the course of the year following his termination proved unsuccessful which compounded the financial difficulties, the emotional stress and the depression he experienced.

## DISCUSSION

■ Defendants move for a new trial under Rule 59 or a remittitur of the verdict. (Docket Entry # 41). Plaintiff argues, in part, that defendants failed in their duty to direct the court and plaintiff to the particular award or evidence that provides the basis for Rule 59 relief. (Docket Entry # 48). The bare bones motion unaccompanied by any other closely related document that would explain the basis is not sufficient. *See Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752, 761 & n. 4 (1st Cir.1996);[10] 12 James Wm. Moore Moore's Federal Practice § 59.10[1] (2009) (discussing particularity requirements for Rule 59 motions).

■ As an alternative basis to deny the motion, the merits do not warrant relief. When faced with a motion for a new trial, it is well settled that the court may independently weigh the evidence. *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir.2009) ("[w]hen deciding whether to grant a new trial, a district court is free to independently weigh the evidence"). Furthermore, the court has a " 'duty to order a new trial whenever, in its judgment, the action is required in order to prevent injustice.' " *Id.*

■ Rule 59(a) requires a new trial " 'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.' "[11] *Crowe v. Marchand*, 506 F.3d 13, 19 (1st Cir.2007); *accord Burke v. McDonald*, 572 F.3d 51, 57 (1st Cir.2009) (reviewing "denial of a motion for a new trial or remittitur for abuse of discretion" and noting " '[w]e will order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice' "); *Rivera Castillo v. Autokirey, Inc.*, 379 F.3d 4, 13 (1st Cir.2004); *Acevedo–Garcia v. Monroig*, 351 F.3d 547, 565 (1st Cir.2003) (when considering "Rule 59(a) motion, 'a district court may set aside a jury's verdict and order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice' "); *see Jennings v. Jones*, 587 F.3d at 438 ("new trial motion standard of review is concerned with whether the verdict is against the weight of the evidence").

■ As to defendants' brevis assertion that the award is "outrageously excessive," it "is axiomatic that damage awards must be based on the evidence presented." *Limone v. United States*, 579 F.3d 79, 107 (1st Cir.2009). A jury's award of damages will withstand scrutiny, however, "unless the damages awarded are 'so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law.' "[12] *Tobin v. Liberty Mutual Insurance Co.*, 553 F.3d 121, 144 (1st Cir.2009) (examining whether $500,000 emotional distress award in disability dis-

---

**10.** The First Circuit in *Cambridge Plating* also recognized that "post-judgment motions are subject to the requirements of Rule 7(b)(1)," Fed.R.Civ.P. *Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d at 760.

**11.** This standard language tracks the language of ground one in defendants' motion.

**12.** Here too, the foregoing standard language tracks the language of ground two in the motion for a new trial or remittitur.

crimination action was excessive); *see Burke v. McDonald,* 572 F.3d at 58 (" '[w]e will uphold a jury award if it is a result of "any rational appraisal or estimate of the damages that could be based on the evidence before the jury" ' ").

■ Examining the record, there is more than sufficient evidence to uphold the jury's verdict as to the USERRA and chapter 151B claims. Sections 4311, 4312 and 4316 of USERRA include distinct claims:

> § 4312 requires an employer to rehire covered employees; § 4311 then operates to prevent employers from treating those employees differently after they are rehired; and § 4316 prevents employers from summarily dismissing those employees for a limited period after they are rehired.

*Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299, 304 (4th Cir.2006).

USERRA gives plaintiff a right to reemployment in his prior civilian job. *See Erickson v. U.S. Postal Service,* 571 F.3d 1364, 1370 (Fed.Cir.2009) (section 4312 gives servicemen right "to reemployment in their civilian jobs after completing their military obligations," citing 38 U.S.C. § 4312(a)). The applicable regulation states:

> As a general rule, the employee is entitled to reemployment in the job position that he or she would have attained with reasonable certainty if not for the absence due to uniformed service. This position is known as the escalator position. The principle behind the escalator position is that, if not for the period of uniformed service, the employee could have been promoted (or, alternatively, demoted, transferred, or laid off) due to

intervening events. The escalator principle requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service. Depending upon the specific circumstances, the employer may have the option, or be required, to reemploy the employee in a position other than the escalator position.

20 C.F.R. § 1002.191.

Another regulation sets out the priority order for an employee who is absent for a period of military service lasting more than 90 days. It reads as follows:

> Following a period of service of more than 90 days, the employee must be reemployed according to the following priority:

> (a) The employee must be reemployed in the escalator position or a position of like seniority, status, and pay. He or she must be qualified to perform the duties of this position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position.

> (b) If the employee is not qualified to perform the duties of the escalator position or a like position after reasonable efforts by the employer, the employee must be reemployed in the position in which he or she was employed on the date that the period of service began or in a position of like seniority, status, and pay. The employee must be qualified to perform the duties of this position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position.[13]

---

**13.** Having considered the evidence of the 2008 expiration of plaintiff's certification, it

does not warrant overturning the verdict.

(c) If the employee is not qualified to perform the duties of the escalator position, the pre-service position, or a like position, after reasonable efforts by the employer, he or she must be reemployed in any other position that is the nearest approximation first to the escalator position and then to the pre-service position. The employee must be qualified to perform the duties of this position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position.

20 C.F.R. § 1002.197 (captioned "What is the reemployment position if the employee's period of service in the uniformed services was more than 90 days?"); *see* 38 U.S.C. § 4313(a)(2).

ASAP's hiring and retention of Tapley does not provide an excuse to refuse plaintiff reemployment in his prior position. The applicable regulation provides that:

the employer may not, however, refuse to reemploy the employee on the basis that another employee was hired to fill the reemployment position during the employee's absence, even if reemployment might require the termination of that replacement employee.

20 C.F.R. § 1002.139(a); *see, e.g., Murphree v. Communications Technologies, Inc.,* 460 F.Supp.2d 702, 704 & 710 (E.D.La.2006) (rejecting the defendant's argument that "the hiring of a replacement employee on a permanent basis constitutes changed circumstances").

The sprinkler helper position lacked the sales commissions and other benefits of plaintiff's preservice position. The evidence supports a significant reduction in pay because the sprinkler helper position lacked an adequate opportunity to pursue and procure sales commissions. The position helping another sprinkler fitter also lacked like status as well as seniority vis-à-vis plaintiff's preservice position.

The evidence fully supports that plaintiff's military service was a motivating or substantial factor in the decision not to reemploy him in a position with like seniority, status and pay. *See Velazquez–Garcia v. Horizon Lines Of Puerto Rico, Inc.,* 473 F.3d 11, 17 (1st Cir.2007) ("we hold that 'in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer] action' "). The failure to respond to plaintiff's certified letter and the proximity in time between the military service and the failure to reemploy is telling. *See id.* (citing *Sheehan v. Department of Navy,* 240 F.3d 1009, 1014 (Fed.Cir.2001)).

■ Plaintiff's military service was also a motivating or substantial factor in the discriminatory and retaliatory action as well as in the October 2008 termination. The failure to terminate another employee with more significant absences and the temporal proximity of the military service with the termination provides evidence that plaintiff's military service was a motivating or substantial factor in the termination. As cogently explained by the *Sheehan* court:

Discriminatory motivation under USERRA may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses. *Cf. W.F. Bolin Co. v. Nat'l Labor Relations Bd.,* 70 F.3d 863, 871 (6th Cir.1995). In de-

termining whether the employee has proven that his protected status was part of the motivation for the agency's conduct, all record evidence may be considered, including the agency's explanation for the actions taken.

*Sheehan v. Department of Navy,* 240 F.3d at 1014.

The comments at the July 2008 meeting and the comments by Cote on October 3, 2008, provide additional evidence that discrimination and retaliation based on plaintiff's military service was a motivating or substantial factor in the employment actions taken by ASAP. Plaintiff's performance and sales prior to the May 2007 deployment evidence his qualifications for the job even considering the expiration of the certification. ASAP's failure to adhere to the progressive discipline policy also supports the jury's USERRA and chapter 151B verdict.

■ As to damages, the back pay award of $42,234 closely mimics the $42,110 computation by plaintiff's economics expert. It is far from excessive and the record provides ample support for the amount.

■ The front pay award under chapter 151B is also not excessive. A recent Massachusetts Supreme Judicial Court case explains the relevant factors to consider:

> The judge properly instructed the jury that front pay damages must be "proven with reasonable certainty," that in awarding such damages they should consider the "amount of future earnings, including salary, bonuses and benefits that the [p]laintiff would have received but for the [d]efendant's unlawful discrimination," that they should not overcompensate the plaintiff, and that the plaintiff had a duty to mitigate her damages by reasonable efforts to secure other employment … The judge also correctly instructed the jury to consider and weigh five factors in determining the amount of any front pay award: (1) the amount of earnings, including salary and benefits, that the plaintiff would have received between the time of trial and the plaintiff's projected retirement date; (2) the plaintiff's probable retirement date; (3) the amount of earnings that the plaintiff would probably have received from another employer until her retirement, which would reduce any front pay award; (4) the availability of other employment opportunities; and (5) the possibility of future wage increases and inflation. *See id.* The judge further instructed that any award of front pay damages must be based on the present discounted value of the income stream, and he provided an explanation of how that value was to be calculated.

*Haddad v. Wal–Mart Stores, Inc.,* 455 Mass. 91, 914 N.E.2d 59, 69 (2009).

Having instructed the jury on these factors, the evidence amply supports the award. At age 43, plaintiff is relatively young in his work life. His work experience speaks to future employment in the fire protection field. (Ex. 29). He engaged in a diligent and reasonable job search after the October 2008 termination. The search was not successful thereby diminishing the availability of other employment opportunities in the near future and the probability of earnings in the near future from another employer. The record provides a rational basis for the $105,000 award.

■ The other damages awards are not excessive. The only award that gives this court pause is the $289,000 award for emotional distress. The record supports a finding that plaintiff went into a deep depression and became a changed person after the termination. He sought and obtained medical treatment, which included taking an antidepressant and sleep aid.

See *Tobin v. Liberty Mutual Insurance Co.*, 553 F.3d at 145 (upholding $500,000 emotional distress damages award and distinguishing 1999 decision reducing $716,000 award in which the plaintiff did *not* seek medical treatment to $250,000). There was little evidence that the deterioration in plaintiff's emotional condition will abate. He continues to take the antidepressant.

His wife and brother-in-law uniformly testified to a changed individual. Plaintiff became short tempered with his family. He also became withdrawn from his family and continues to avoid family activities. In contrast to the "nice family" his wife testified existed before the discriminatory and retaliatory treatment in 2008, plaintiff argues with his wife and family. His brother-in-law described a particularly divisive argument that visibly and emotionally effected plaintiff. *See McDonough v. City of Quincy*, 452 F.3d 8, 22 (1st Cir. 2006) (discussing prior award upheld partly because of the plaintiff's testimony that the employment discrimination caused marriage to suffer). Plaintiff avoids his children and has gained weight.

Although the award is undeniably generous, particularly in light of the relatively short period of the employment prior to the May 2007 deployment, it is not so grossly disproportionate to the emotional injury the evidence established such that it would be unconscionable to let it stand. *See, e.g., Tobin v. Liberty Mutual Insurance Co.*, 553 F.3d at 144–145; *McDonough v. City of Quincy*, 452 F.3d at 22 (upholding $300,000 compensatory award the bulk of which represented emotional distress damages). As a final matter, it is also worth recognizing " ' "the esoteric nature of damages for emotional distress." ' " *Tobin v. Liberty Mutual Insurance Co.*, 553 F.3d at 145. Thus, the " 'disinclination to second-guess a jury's evaluation of the proper amount of damages is magnified where,' " as here, " 'the damages entail a monetary valuation of intangible losses.' " *Blinzler v. Marriott International, Inc.*, 81 F.3d 1148, 1161 (1st Cir.1996).

In sum, a new trial is not warranted. A remittitur, even on the generous emotional distress damages, is likewise not required.

### CONCLUSION

Accordingly, the motion for a new trial or a remittitur (Docket Entry # 41) is **DENIED.**